IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                                          Case No.  3:17cr125

OMAR VILLARREAL SILVA,

Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Omar Villarreal Silva's Second Motion

to Dismiss the Indictment (the "Second Motion to Dismiss"). (ECF No. 28.) The United States

responded, (ECF No. 31), and Villarreal replied, (ECF No. 32). On May 11, 2018, the Court

heard argument on the Second Motion to Dismiss.[1] The Motion to Dismiss is ripe for

disposition. For the reasons discussed below, the Court will deny the Second Motion to Dismiss.

### I. Factual and Procedural Background

Villarreal, a citizen of Mexico, first came to the United States in 1996 at the age of

seventeen. He has six siblings, three of whom currently live in the United States. Villarreal also

has three children, ages sixteen, twelve, and three. All his children were born in the United

States to Villarreal and his partner, and they live in Hopewell, Virginia. While in the United

States, Villarreal worked in construction and sent money to his parents in Mexico every month.

Villarreal has twice been removed from the United States under orders of removal: first

on September 1, 2014, and later on November 20, 2014. He also has been apprehended by

United States Border Patrol and allowed to voluntarily return to Mexico five times: twice in

1998, and three times in 1999. Villarreal's criminal history currently includes nine criminal

_____

[1] The parties also presented a two-page document containing factual stipulations about
Villarreal's background, criminal record, and deportation history. (ECF No. 34.)

convictions within the United States—six misdemeanor convictions and three felony convictions.

In February of 2014, Chesterfield County, Virginia, police officers arrested Villarreal for "DWI, Third Offense," and Villarreal was found guilty. Villarreal's arrest and conviction prompted the police to notify immigration officials, who interviewed Villarreal, determined that he was removable, and lodged a detainer. On September 2, 2014, Villarreal appeared before an Immigration Judge in Arlington, Virginia, who ordered Villarreal removed from the United States (the "September 2, 2014 Order of Removal"). On September 11, 2014, immigration officials physically removed Villarreal from the country and returned him to Mexico.

On November 20, 2014, Villarreal attempted to re-enter the United States by presenting a passport that was not his at the El Paso, Texas, Port of Entry. After determining that the passport did not belong to Villarreal, immigration officials placed him into expedited removal proceedings and issued an Order of Removal (the "November 20, 2014 Order of Removal").[2] The November 20, 2014 Order of Removal states that Villarreal was deemed removable pursuant to 8 U.S.C. § 1225(b)(1)[3] (the "Expedited Removal Statute") because immigration officials

---

[2] At the time of the November 20, 2014 Order of Removal, Villarreal's criminal history consisted of six misdemeanor convictions and one felony conviction.

[3] Section 1225(b)(1), the Expedited Removal Statute, provides that when an alien arriving in the United States seeks admission to the United States, but either lacks the necessary entry documents, misrepresents his or her citizenship, or presents fraudulent entry documents, he or she shall be removed without further hearing or review. 8 U.S.C. § 1225(b)(1)(A)(i). When Villarreal attempted to enter the United States in November 20, 2014, his lack of valid entry documents and use of a false passport resulted in the November 20, 2014 Order of Removal at issue here.

The Expedited Removal Statute does not apply to aliens from certain countries in the Western Hemisphere, 8 U.S.C. § 1225(b)(1)(F), and gives all arriving aliens an opportunity to apply for asylum or assert a fear of persecution, 8 U.S.C. § 1225(b)(1)(A)(ii)–(iii), (B). It also provides for administrative review of orders of removal issued against lawful permanent

determined that he was inadmissible under sections 212(a)(6)(C)(ii),[4] (the "Fraudulent Entry

Statute"), and (7)(A)(i)(I),[5] (the "No Entry Document Statute"), of the Immigration and

Nationality Act. The November 20, 2014 Order of Removal states that on November 20, 2014,

Villarreal "falsely represented [himself] to be a United States citizen . . . [t]o gain entry into the

United States," in violation of the Fraudulent Entry Statute, and that he also violated the No

Entry Document Statute because he was "an immigrant not in possession of a valid unexpired

immigrant visa, reentry permit, border crossing card, or other valid entry document required by

the Immigration and Nationality Act." (Second Mot. Dismiss, Ex. 1 at 10, ECF No. 28-1.)

      The next day, on November 21, 2014, the United States Attorney's Office in the Western

District of Texas instituted a criminal prosecution of Villarreal for his attempted reentry. On

December 17, 2014, a grand jury returned a two-count indictment charging Villarreal with Illegal

Reentry, in violation of 8 U.S.C. § 1326(a),[6] and Improper Use of Another's Passport, in

violation of 18 U.S.C. § 1544. Villarreal pleaded guilty to both counts and was sentenced to

fifteen months' imprisonment. On December 23, 2016, after he had served his sentence,

---

residents, and aliens who have been granted asylum or refugee status. 8 U.S.C. § 1225(b)(1)(C).
Neither party asserts that any of these exceptions apply to Villarreal.

    [4] Section 212(a)(6)(C), codified at 8 U.S.C. § 1182(a)(6)(C), the Fraudulent Entry
Statute, provides in relevant part that aliens who misrepresent themselves as citizens or who
present fraudulent entry documents for the purpose of gaining any immigration benefit are
inadmissible. 8 U.S.C. § 1182(a)(6)(C).

    [5] Section 212(a)(7)(A)(i)(I), codified at 8 U.S.C. § 1182(a)(7)(A)(i), the No Entry
Documents Statute, provides that any alien who lacks proper entry documents at the time he or
she applies for admission is inadmissible. 8 U.S.C. § 1182(a)(7)(A)(i).

    [6] Section 1326(a), the Criminal Illegal Reentry Statute, makes it a crime for any alien
"who has been denied admission, excluded, deported, or removed or has departed the United
States while an order of exclusion, deportation, or removal is outstanding" to subsequently enter,
attempt to enter, or at any time be found in the United States without advance permission from
the Attorney General. 8 U.S.C. § 1326(a).

immigration officials physically removed Villarreal from the country and returned him to Mexico.

On August 6, 2017, Villarreal was again found in the United States when Chesterfield County police officers arrested him for "Obstruct Justice: Without Force," "DWI: Previous Felon," and "Driving While Suspended." The next day, officials in the Chesterfield County Jail notified Richmond immigration authorities that Villarreal was in their custody. On September 20, 2017, a grand jury in the Eastern District of Virginia returned the instant one-count Indictment, again charging Villarreal with a violation of 8 U.S.C. § 1326(a), the Criminal Illegal Reentry Statute.[7]

On January 5, 2018, Villarreal filed his first motion to dismiss (the "First Motion to Dismiss"). In the First Motion to Dismiss, Villarreal sought to collaterally attack both the September 2, 2014 Order of Removal and the November 20, 2014 Order of Removal, arguing that he was deprived of due process in both of those deportation proceedings. On February 15, 2018, the Court heard argument on the First Motion to Dismiss. Because the parties' briefing on the First Motion to Dismiss largely argued the merits as to success under 8 U.S.C. § 1326(d) (the "Collateral Attack Subsection"),[8] the Court, identifying a threshold issue which neither party had

---

[7] The Indictment in this case also alleges that Villareal violated 8 U.S.C. § 1326(b)(1), (the "Three-Time Offender Enhancement Subsection"), which provides that an alien subject to prosecution under the Criminal Illegal Reentry Statute "whose removal was subsequent to a conviction for commission of three or more misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony)," shall be subject to enhanced criminal penalties. 8 U.S.C. § 1326(b)(1).

[8] Section 1326(d), the Collateral Attack Subsection, limits collateral attacks in the context of a prosecution under the Criminal Illegal Reentry Statute by requiring the alien to meet three criteria. 8 U.S.C. § 1326(d). The alien must establish that: "(1) [he or she] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the

squarely addressed, asked the parties to address the relevance of 8 U.S.C. § 1225,[9] (the

"Jurisdiction-Stripping Statute"), to Villarreal's First Motion to Dismiss. It was not until

questioning by the Court that it became apparent that Villarreal intended to challenge the

constitutionality of that provision. Holding that Villarreal had "not adequately raised [the]

constitutional challenge . . . in a way that the Court can decide," the Court denied the First

Motion to Dismiss without prejudice. (Feb. 23, 2018 Mem. O. 7, ECF No. 27.) The Court

allowed Villarreal to file a second motion to dismiss, which he timely did.

    Villarreal argues in the Second Motion to Dismiss that the Court must dismiss the

Indictment because neither the September 2, 2014 Order of Removal nor the November 20, 2014

Order of Removal constitute valid orders of removal on which a prosecution for Illegal Reentry

in violation of 8 U.S.C. § 1326(a) may be premised. Subsequent briefing and argument from

both parties established that the November 20, 2014 Order of Removal is the only removal

challenged at bar.[10] In the Second Motion to Dismiss, Villarreal finally presents his

---

opportunity for judicial review; and[,] (3) the entry of the order was fundamentally unfair."
8 U.S.C. § 1326(d).

[9] Section 1225(b)(1)(D), the Jurisdiction-Stripping Statute, provides, as relevant here, that in a criminal prosecution under the Criminal Illegal Reentry Statute, the court "shall not have jurisdiction to hear" any collateral attack of an order of removal entered under the Expedited Removal Statute. 8 U.S.C. § 1225(b)(1)(D).

[10] The Indictment does not specify on which removal the instant charge is premised. The United States need only prove that Villarreal has had one prior removal to meet its burden under the Criminal Illegal Reentry Statute. The United States repeatedly has represented that the instant prosecution is premised only on the November 20, 2014 Order of Removal, and Villarreal conceded at oral argument on February 15, 2018, that he only seeks to challenge the November 20, 2014 Order of Removal.
    Aside from the parties' agreement, the United States' repeated, clear, and unambiguous statement that it premises Villarreal's prosecution under the Criminal Illegal Reentry Statute only on the November 20, 2014 Order of Removal constitutes a judicial admission, which limits the United States to relying only on the November 20, 2014 Order of Removal for this prosecution. *See, e.g., Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 n.2 (4th Cir. 2004) ("'[D]eliberate,

constitutional challenge. Villarreal argues that either the Jurisdiction-Stripping Statute is

unconstitutional when applied in context of a prosecution under the Criminal Illegal Reentry

Statute, or Congress intended that prosecutions under the Criminal Illegal Reentry Statute could

not be premised on expedited removals. The United States has responded, and Villarreal has

replied. The constitutional question is therefore squarely before the Court.

The Court finds that 8 U.S.C. § 1225(b)(1)(D), the Jurisdiction-Stripping Statute, is

unconstitutional to the extent it prohibits, in a subsequent prosecution under 8 U.S.C. § 1326(a),

the Criminal Illegal Reentry Statute, "*some* meaningful review" of an alien's claim that the

underlying deportation proceeding, which constitutes an element of the criminal charge, was

"fundamentally unfair." *United States v. Mendoza-Lopez*, 481 U.S. 828, 838–39 (1987).

However, because Villarreal cannot establish that the deportation proceeding underlying the

November 20, 2014 Order of Removal was fundamentally unfair, the Court will deny

Villarreal's Second Motion to Dismiss.

## II.
### The Jurisdiction-Stripping Statute is Unconstitutional to the Extent it Prohibits *Some* Meaningful Review of a Deportation Proceeding on Which a Subsequent Criminal Prosecution is Based

*Mendoza-Lopez* requires that, "where a determination made in an administrative

proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there

must be *some* meaningful review of the administrative proceeding." 481 U.S. at 837–38.

Although the Collateral Attack Subsection provides for judicial review of some orders of

removal in the context of prosecutions based on the Criminal Illegal Reentry Statute, the

---

clear[,] and unambiguous' statements by counsel may be considered judicial admissions that
bind the conceding party to the representations made." (quoting *MacDonald v. Gen. Motors
Corp.*, 110 F.3d 337, 340–41 (6th Cir. 1997)); *see also United States v. Blood*, 806 F.2d 1218,
1221 n.2 (4th Cir. 1986). The Court therefore examines only the November 20, 2014 Order of
Removal.

Jurisdiction-Stripping Statute, by its plain language, prohibits judicial review of the validity of an expedited removal, such as the November 20, 2014 Order of Removal, in the context of a prosecution under the Criminal Illegal Reentry Statute. 8 U.S.C. § 1225(b)(1)(D). The Jurisdiction-Stripping Statute also expressly provides that the Criminal Illegal Reentry Statute applies to aliens who were removed pursuant to the Expedited Removal Statute. But when an alien is prosecuted under the Criminal Illegal Reentry Statute after being removed pursuant to an expedited removal order, that removal order constitutes an element of the subsequent criminal charge, which—through the combined operation of the Expedited Removal Statute and the Jurisdiction-Stripping Statute—cannot be reviewed.

The Court therefore must conclude that the Jurisdiction-Stripping Statute, 8 U.S.C. § 1225(b)(1)(D), is unconstitutional to the extent it prohibits "*some* meaningful review" in a prosecution under the Criminal Illegal Reentry Statute of an alien's claim that the underlying deportation proceeding was "fundamentally unfair." *Mendoza-Lopez*, 481 U.S. at 838–39.

### A. *Mendoza-Lopez* Requires *Some* Meaningful Review When a Subsequent Criminal Prosecution is Based on an Earlier Deportation Proceeding

In *Mendoza-Lopez*, two aliens were arrested in Nebraska, subjected to group deportation proceedings, and ordered deported to Mexico. 481 U.S. at 830. Two months later, after being found again in Nebraska, both aliens were arrested and charged with violations of the Criminal Illegal Reentry Statute. *Id.* Both moved to dismiss their indictments, arguing that they had been "inadequately informed . . . of their right to counsel" at the group deportation proceedings, and that their unknowing waivers of the right to apply for suspension of deportation and appeal had been accepted, in violation of their due process rights. *Id.* at 831–32. The district court accepted the defendants' arguments and dismissed their indictments. *Id.* The circuit court affirmed. *Id.*

On review, the Supreme Court of the United States first held that the language of the Criminal Illegal Reentry Statute at the time did not allow an alien to collaterally attack a previous deportation order in the context of a criminal prosecution under that statute. *Id.* at 835. The Supreme Court also held that Congress *intended* not to permit such a collateral challenge.[11] *Id.* But the Supreme Court held that its inquiry could not end there because "[i]f the statute envisions that a court may impose a criminal penalty for reentry after *any* deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been, *the statute does not comport with the constitutional requirement of due process.*" *Id.* at 837 (second emphasis added). The *Mendoza-Lopez* Court further held that, regardless of congressional intent or the plain language of the statute, "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Id.* at 837–38.

The Supreme Court did not challenge the ability of Congress to determine the extent of review—judicial or administrative—provided to aliens in the *underlying administrative deportation proceedings*. Rather, the Court held that "[p]ersons *charged with crime* are entitled to have the factual and legal determinations upon which convictions are based subjected to the scrutiny of an impartial judicial officer." *Id.* at 841 (emphasis added). For this reason, "[d]epriving an alien of the right to have the disposition in a deportation hearing reviewed in a

---

[11] Nine years after *Mendoza-Lopez*, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and changed the language of parts of the Criminal Illegal Reentry Statute. *See* Pub. L. 104-132 § 441 (codified at 8 U.S.C. § 1326(d)). As relevant, Congress added the Collateral Attack Subsection, thereby expressly providing for a collateral attack of a previous deportation order in the context of a prosecution under the Criminal Illegal Reentry Statute. *See* 8 U.S.C. § 1326(d); *see also Moreno-Tapia*, 848 F.3d 162, 165–66 (4th Cir. 2017) ("Congress responded by codifying the principle of *Mendoza-Lopez* in 8 U.S.C. § 1326(d)."). When it passed AEDPA, Congress also added the Jurisdiction-Stripping Statute. *See* Pub. L. 104-132 § 423 (codified at 8 U.S.C. § 1225(b)(1)(D)).

judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense." *Id.* at 839 (footnote omitted).

Based on these constitutional principles, the *Mendoza-Lopez* Court held that it could review the aliens' challenge to the underlying deportation proceedings, despite clear congressional intent that no such review occur. *Id.* at 841–42. Because the government had asked the Court to assume that the aliens' "deportation hearing was 'fundamentally unfair,'" the Court ruled that the United States could not rely on the prior deportation orders as "reliable proof of an element of a criminal offense." *Id.* at 839–40. Courts have since interpreted *Mendoza-Lopez* as standing for the requirement that an alien is "entitled, as a matter of due process, to bring a collateral challenge to a fundamentally unfair deportation proceeding, provided that the alien had been effectively deprived of his [or her] right to judicial review." *United States v. Charleswell*, 173 F.3d 425, at *1 (4th Cir. 1999) (unpublished table decision) (citing *Mendoza-Lopez*, 481 U.S. at 838–39); *see also United States v. Barajas-Alvarado*, 655 F.3d 1077, 1083 (9th Cir. 2011) ("*Mendoza-Lopez* makes clear that the alien is entitled to judicial review of a claim that the prior proceeding was 'fundamentally unfair' and thus cannot be used as a predicate for a criminal case, where the prior proceeding was not previously subjected to judicial review." (quoting *Mendoza-Lopez*, 481 U.S. at 839)).

B.    **The Collateral Attack Subsection Provides for Review in the Context of Most Prosecutions Under the Criminal Illegal Reentry Statute**

The Collateral Attack Subsection, 8 U.S.C. § 1326(d) codifies the *Mendoza-Lopez* principle that due process entitles a defendant to some meaningful review of a deportation order on which a subsequent prosecution under the Criminal Illegal Reentry Statute is premised. *See, e.g., Moreno-Tapia*, 848 F.3d at 165–66 (discussing *Mendoza-Lopez*'s holding that defendants

are entitled to collaterally attack their deportation order in a subsequent prosecution for illegal reentry, and stating that "Congress responded by codifying the principle of *Mendoza-Lopez* in 8 U.S.C. § 1326(d)").

Section 1326(d) limits collateral attacks in the context of a prosecution under the Criminal Illegal Reentry Statute by requiring the alien to meet three criteria. 8 U.S.C. § 1326(d). The alien must establish that: "(1) [he or she] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and[,] (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). The defendant bears the burden of proof and must satisfy all three requirements for a collateral attack to prevail. *See, e.g.*, *United States v. Ortiz*, 488 F. App'x. 717, 717–18 (4th Cir. 2012) ("A defendant must satisfy all three of the above requirements to prevail." (citing *United States v. Wilson*, 316 F.3d 506, 509 (4th Cir. 2003), *abrogated on other grounds by Lopez v. Gonzales*, 549 U.S. 47 (2006))). If the defendant meets all three requirements, "the illegal reentry charge must be dismissed as a matter of law." *United States v. El Shami*, 434 F.3d 659, 663 (4th Cir. 2005).

### C. The Jurisdiction-Stripping Statute Divests District Courts of the Power to Hear Collateral Attacks of Expedited Orders of Removal in a Subsequent Prosecution Under the Criminal Illegal Reentry Statute

At the same time, 8 U.S.C. § 1225(b)(1)(D), the Jurisdiction-Stripping Statute deprives courts of jurisdiction to consider collateral attacks of certain types of removal orders in the context of prosecutions under the Criminal Illegal Reentry Statute. The Jurisdiction-Stripping Statute provides:

> In any action brought against an alien under section 1325(a) of this title or section 1326[, the Criminal Illegal Reentry Statute,] of this title, *the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i)[,the Expedited Removal Statute,] or (B)(iii)*.

8 U.S.C. § 1225(b)(1)(D) (emphasis added).  One of the subparagraphs referenced, 8 U.S.C.

§ 1225(b)(1)(A)(i), the Expedited Removal Statute, provides:

> If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible *under [the "Fraudulent Entry Statute] or [the No Entry Document Statute]*, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

8 U.S.C. § 1225(b)(A)(1)(i) (emphasis added).  Unless an alien is a lawful permanent resident,

indicates an intention to apply for asylum, or expresses a fear of persecution,[12] the Expedited

Removal Statute expressly prohibits any "further hearing or review" before the alien is removed

from the United States.  *Id.*

Taken together, the Jurisdiction-Stripping Statute and the Expedited Removal Statute

provide that, during a prosecution under the Criminal Illegal Reentry Statute, no court has

jurisdiction to review—in the context of a collateral attack or otherwise—orders of removal

issued pursuant to the Expedited Removal Statute when the alien was found inadmissible under

either the Fraudulent Entry Statute or the No Entry Document Statute.  This is precisely the

circumstance Villarreal brings to this Court.

### 1.    Well-Established Principles of Statutory Interpretation Guide the Court's Analysis

Under well-settled principles of statutory construction, the Court's analysis must "begin,

as always, with the language of the statutory text," and "[i]n the absence of a definition from

Congress, [the Court] accord[s] words in a statute their ordinary, contemporary, common

meaning." *United States v. Midgett*, 198 F.3d 143, 145–46 (4th Cir. 1999) (internal citation and

quotation marks omitted).  "The plainness or ambiguity of statutory language is determined by

---

[12] Neither party asserts that Villarreal proceeded, attempted to proceed, or would have qualified under any of these exceptions.

reference to the language itself, the specific context in which that language is used, and the

broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

When "the terms of a statute are unambiguous on their face, or in light of ordinary principles of

statutory interpretation," judicial inquiry normally ends. *United States v. Morison*, 844 F.2d

1057, 1064 (4th Cir. 1988).

## 2. The Court Faces an Issue of First Impression Within the Fourth Circuit

Neither party identifies any opinion from either the United States Court of Appeals for

the Fourth Circuit or any district court within the Fourth Circuit addressing the relationship

between *Mendoza-Lopez* and the Jurisdiction-Stripping Statute in the context of a prosecution

under the Criminal Illegal Reentry Statute. Nor does the Court see such a case. That said, the

United States asserts that "[t]he Fourth Circuit has addressed the statutory limitation of

jurisdiction question in a highly analogous case concerning a limitation on an appeal right."

(Resp. Second Mot. Dismiss 11, ECF No. 31.) In support of this statement, the United States

cites to *Hall v. I.N.S.*, 167 F.3d 852, 857 (4th Cir. 1999),[13] stating that, in *Hall*, "the Fourth

---

[13] *Hall* considers an alien's appeal of his final order of deportation. 167 F.3d at 853. *Hall* holds that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") § 309(c)(4)(G) divests the Fourth Circuit of jurisdiction to hear Hall's appeal of his final order of deportation. *Id.* at 857. As *Hall* states—and the United States quotes—"[t]he Supreme Court has long said in the immigration context that Congress is generally free to leave final factfinding in the executive branch." *Id.* (citing *Carlson v. Landon*, 342 U.S. 524, 537–38 (1952) ("The power to expel aliens, being essentially a power of the political branches of government, . . . may be exercised entirely through executive officers, with such opportunity for judicial review of their action as Congress may see fit to authorize or permit." (internal quotation marks omitted)).

Hall's *appeal* of his deportation order stands in juxtaposition to Villarreal's *collateral attack* of his deportation order in the context of a criminal prosecution. Villarreal seeks to collaterally attack "a determination made in an administrative proceeding [that] is to play a critical role in the subsequent imposition of a criminal sanction." *Mendoza-Lopez*, 481 U.S. at 837–38. Imposition of a criminal sanction in such a situation requires "*some* meaningful review of the administrative proceeding" *id.*, because "[p]ersons *charged with crime*[—unlike people appealing immigration determinations—]are entitled to have the factual and legal

12

Circuit rejected a constitutional challenge to the restriction on the appellate court's jurisdiction." (*Id.*)

The United States' citation to *Hall* as a "highly analogous case" illuminates its failure to recognize that the constitutional question before the Court is the due process to which *criminal defendants* are entitled when prosecuted under the Criminal Illegal Reentry Statute. More specifically, *Mendoza-Lopez* evaluates the due process requirements for prosecuting an alien under the Criminal Illegal Reentry Statute. When such a prosecution relies on a previous expedited removal, as does the prosecution at bar, an element of the prosecution rests on a deportation proceeding that lacked any judicial review whatsoever. The United States' focus on the due process required in the underlying *deportation proceeding* rather than the due process required in the *criminal prosecution* at bar is misplaced.

For the same reason, the United States' argument that "[t]he majority of courts' holdings, barring *habeas jurisdiction* to review the validity of expedited removal orders, apply with force here" fails. (Resp. Second Mot. Dismiss 9 (emphasis added).) In the unique context before the Court—in which the United States seeks to impose a criminal sanction based on a "determination made in an administrative proceeding,"—the Constitution requires "*some* meaningful review of the administrative proceeding," *Mendoza-Lopez*, 481 U.S. at 837–38, because "[p]ersons *charged with crime*[—unlike those seeking habeas relief—]are entitled to have the factual and legal determinations upon which convictions are based subjected to the scrutiny of an impartial judicial officer," *id.* at 841 (emphasis added). *Cf. Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir. 2002) (reviewing a habeas petition alleging a due process violation in the course of deportation proceedings, and holding that *Mendoza-Lopez* does not govern because "[i]n *Mendoza–Lopez*,

---

determinations upon which convictions are based subjected to the scrutiny of an impartial judicial officer," *id.* at 841 (emphasis added).

the question before the court was whether a defendant who was being *criminally* prosecuted for illegally reentering after lawful deportation could collaterally attack the prior deportation order. . . . It is an overly expansive, and in fact, an incorrect, reading of *Mendoza–Lopez* to suggest that the Constitution requires 'meaningful review' of any and all administrative procedures").

### 3. Read Together, the Expedited Removal Statute, the Criminal Illegal Reentry Statute, and the Jurisdiction-Stripping Statute Prohibit Any Review of an Expedited Order of Removal

The Court begins, as it must, with the statutory text, giving the words their ordinary, contemporary meaning. *See Midgett*, 198 F.3d at 145–46. The Expedited Removal Statute, when considered alongside the Criminal Illegal Reentry Statute and the Jurisdiction-Stripping Statute plainly and unambiguously divests district courts of jurisdiction to hear collateral challenges to expedited orders of removal such as the November 20, 2014 Order of Removal,[14] and prohibits *any* review of orders of removal under the Expedited Removal Statute.

---

[14] Given the Jurisdiction-Stripping Statute's clear and unambiguous language, the statute is not reasonably susceptible to more than one construction. For this reason, Villarreal's argument that the Court should apply the doctrine of constitutional avoidance and construe the Jurisdiction-Stripping Statute as "preclud[ing] the use of expedited removals as predicates for a prosecution under [the Criminal Illegal Reentry Statute]," (Second Mot. Dismiss 4, ECF No. 28), fails.

The canon of constitutional avoidance "'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). Unless more than one plausible construction of the statute exists, "the canon simply has no application." *Id.* (internal quotation marks omitted). However, "[s]potting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to 'choos[e] between competing *plausible* interpretations of a statutory text.'" *Id.* at 843 (quoting *Clark*, 543 U.S. at 381) (first alteration added).

The plain language of the Jurisdiction-Stripping Statute precludes application of the constitutional avoidance doctrine in the manner Villarreal urges. Moreover, the language precluding collateral attack would be superfluous if a prosecution under the Criminal Illegal Reentry Statute could not be premised on an expedited removal order. The Court will not interpret the statute in a way that makes some of its language unnecessary, *see, e.g., Bowsher v. Merck & Co.*, 460 U.S. 824, 833 (1983) (identifying the "settled principle of statutory construction that [the court] must give effect, if possible, to every word of the statute"), nor will

First, the Expedited Removal Statute provides that when an immigration officer determines an alien "arriving in the United States" inadmissible under either the Fraudulent Entry Statute or the No Entry Document Statute, that officer "*shall* order the alien removed from the United States *without further hearing or review*" unless the alien requests asylum or indicates fear of persecution. 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added). The plain language of the Expedited Removal Statute, therefore, prohibits any hearing or review of an immigration officer's determination regarding the alien's inadmissibility.

At the same time, the plain language of the Criminal Illegal Reentry Statute allows criminal prosecution of "*any* alien who . . . has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding," and later "enters, attempts to enter, or is at any time found in, the United States." 8 U.S.C. § 1326(a)(1) (emphasis added). The Criminal Illegal Reentry Statute does not explicitly exclude prosecution of aliens previously deported based on expedited removals.

Indeed, the Jurisdiction-Stripping Statute *directly* refers to the use of expedited removal orders in prosecutions under the Criminal Illegal Reentry Statute. 8 U.S.C. § 1225(b)(1)(D) (precluding the collateral review of expedited removal orders "[i]n any action brought against an alien under . . . [the Criminal Illegal Reentry Statute]"). Although the Collateral Attack Subsection explicitly authorizes collateral attacks of prior deportation orders in prosecutions under the Criminal Illegal Reentry Statute, the Jurisdiction-Stripping Statute *expressly* precludes

it "rewrite [the] statute as it pleases" to avoid deciding the constitutional issue, *Jennings*, 138 S. Ct. at 843.

Because both the Criminal Illegal Reentry Statute and the Jurisdiction-Stripping Statute directly contemplate prosecution under the Criminal Illegal Reentry Statute based on a previous removal under the Expedited Removal Statute, the Jurisdiction-Stripping Statute is not reasonably susceptible to more than one construction. The doctrine of constitutional avoidance cannot apply.

such collateral attacks. The Criminal Illegal Reentry Statute therefore allows the criminal prosecution of aliens such as Villarreal when an element of the offense—a previous order of removal—has never been subjected to independent review of any kind by a judicial officer.

In sum, the Jurisdiction-Stripping Statute, when "determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole," *Robinson*, 519 U.S. at 341, plainly and unambiguously divests district courts of jurisdiction to hear collateral challenges to expedited orders of removal such as the November 20, 2014 Order of Removal. And Congress has provided for no other judicial review— meaningful or otherwise—of removals pursuant to the Expedited Removal Statute. The Criminal Illegal Reentry Statute indicates a clear congressional intent that prosecution for illegal reentry may be based on a prior removal under the Expedited Removal Statute.

Because of this interplay between the statutes, the Jurisdiction-Stripping Statute is unconstitutional to the extent it prohibits "*some* meaningful review" in a prosecution under the Criminal Illegal Reentry Statute of an alien's claim that an element of the subsequent criminal charge—the underlying deportation proceeding—was "fundamentally unfair." *Mendoza-Lopez*, 481 U.S. at 839.

### 4. Congressional Intent That the Statutes Apply Simultaneously Cannot Override Constitutional Principles

The United States argues, not unconvincingly, that when Congress passed the AEDPA, which included both the Collateral Attack Statute and the Jurisdiction-Stripping Statute, it intentionally distinguished between removal orders issued against aliens already present in the United States, to whom the Collateral Attack Statute applies, and so-called "arriving aliens," to whom the Jurisdictional-Stripping Statute applies. According to the United States, Congress recognized that arriving aliens have fewer due process entitlements than those aliens present in

the United States, meaning that Congress intended to—and, according to the United States, appropriately did—prevent arriving aliens subjected to expedited removal from collaterally attacking their orders of removal in any subsequent criminal prosecution.

This is logical, argues the United States, because

[b]oth *Mendoza-Lopez* and [the Collateral Attack Subsection] make explicit reference to due process violations being a necessary predicate to a collateral attack. Because the arriving defendant had *no due process rights* at the time of his expedited removal at the border, *by definition, he cannot collaterally attack* his removal under *Mendoza-Lopez*, its progeny, and [the Collateral Attack Subsection], Congress, recognizing this, appropriately prohibited such collateral attacks, in [the Jurisdiction-Stripping Statute], barring review of the expedited removal order entered at the border here.

(Resp. Second Mot. Dismiss 8 (emphasis added).)

The United States could well be correct that Congress intended to create one statute governing removals of aliens present in the United States at the time of their apprehension and a separate statute governing removals of arriving aliens. Given the lack of legislative history on the matter, however, the Court declines to attribute motives to Congress without statements or records suggesting one purpose over another. More importantly, even congressional intent to create such a statutory scheme does not necessarily render the statutory scheme constitutional.

The United States' argument first founders for contending that arriving aliens lack due process rights altogether. Although "an alien on the threshold of initial entry stands on a different footing" than an alien present in the country, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953), an arriving alien removed pursuant to the Expedited Removal Statute still has *some* due process rights. "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id.* (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).

17

No dispute exists that the Expedited Removal Statute requires *some* process before an immigration officer may remove an arriving alien pursuant to that statute. *See* 8 C.F.R. § 253.3(b) (describing the procedures for entering an order of expedited removal); *Barajas-Alvarado*, 655 F.3d at 1088 (discussing "the applicable procedures" in an expedited removal proceeding). Even given the minimal due process rights to which arriving aliens are entitled, it cannot be said that they have *no* due process rights and therefore could never make out a claim of fundamental unfairness under *Mendoza-Lopez*. Considered in the full statutory and constitutional context, the United States' arguments about an arriving alien's lack of due process rights or inability to collaterally attack his or her removal cannot persuade.

Second, the United States errs because, under *Mendoza-Lopez*, in determining whether an alien may *collaterally attack* a deportation order that forms the basis of a prosecution under the Criminal Illegal Reentry Statute, the relevant due process analysis is the due process accorded a *criminal* defendant, not the due process to which the alien was entitled at the time of the deportation proceedings. *See Mendoza-Lopez*, 481 U.S. at 839 ("[A] collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review . . . .") The due process to which the alien was entitled at the time of the deportation proceedings is relevant in determining whether the collateral attack *succeeds*; it does not determine whether the collateral attack may *occur*.[15] *See id.*

---

[15] For this reason, the United States focuses on the wrong proceeding when it argues that, "[b]ecause the arriving defendant had no due process rights at the time of his expedited removal at the border, by definition, he cannot collaterally attack his removal under *Mendoza-Lopez*, its progeny, and [the Collateral Attack Subsection]." (Resp. Second Mot. Dismiss 8.) By concentrating on the due process rights Villarreal had "at the time of his *expedited removal* at the border," (*id.*), the United States neglects the *criminal* context of the proceeding before the Court.

*Mendoza-Lopez* relies on the due process rights to which a *criminal defendant* is entitled. 481 U.S. at 839 ("[A] collateral challenge to the use of a deportation proceeding *as an element of a criminal offense* must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review." (emphasis added)). Although the Supreme Court in *Mendoza-Lopez* "accept[ed] the legal conclusions of the court below that the deportation hearing violated due process," it grounded its holding not on the denial of due process but on its conclusion that "respondents were deprived of judicial review of their deportation proceeding." *Id.* at 840. In sum, under *Mendoza-Lopez*, "where a determination made in an administrative proceeding is to play a critical role in the *subsequent imposition of a criminal sanction*, there must be *some* meaningful review of the administrative proceeding." *Id.* at 837–38 (first emphasis added).

### III.
**Villarreal's Collateral Attack Cannot Succeed Because He Fails to Establish that the Deportation Proceeding Resulting in the November 20, 2014 Order of Removal was "Fundamentally Unfair"**

Consistent with *Mendoza-Lopez*, the Court must determine whether the deportation proceedings involved in the November 20, 2014 Order of Removal were "fundamentally unfair." *Mendoza-Lopez*, 481 U.S. at 839.[16] In the context of immigration proceedings, the Fourth Circuit has held that "[i]n order to establish fundamental unfairness, a defendant must show that (1) his [or her] due process rights were violated by defects in [the] underlying deportation proceeding, and (2) he [or she] suffered prejudice as a result of the defects." *Wilson*, 316 F.3d at 510. Even assuming that he can point to a due process violation, Villarreal fails to establish

---

[16] Although the Collateral Attack Subsection generally governs a court's analysis of collateral attacks in the context of a prosecution under the Criminal Illegal Reentry Statute, because the Jurisdiction-Stripping Statute explicitly bars application of the Collateral Attack Subsection to removals pursuant to the Expedited Removal Statute, the Collateral Attack Subsection does not govern the Court's review of the November 20, 2014 Order of Removal. *Mendoza-Lopez*'s "fundamentally unfair" standard guides the Court's analysis.

prejudice resulting from that violation, so he cannot carry his burden of establishing that the

deportation proceedings leading to the November 20, 2014 Order of Removal were

fundamentally unfair.

    A.    **Even Assuming that Villarreal Identifies a Due Process Violation Stemming from the Deportation Proceedings Resulting in the November 20, 2014 Order of Removal, He Cannot Establish that He Suffered Prejudice As a Result**

Villarreal argues that the November 20, 2014 deportation proceedings denied him due

process in two ways. First, he contends that he was prevented from participating in the expedited

removal proceedings after he requested the assistance of counsel. According to Villarreal, "the

[immigration] officers told him he had a right (to consult with an attorney during questioning);

he invoked that right; and then they denied him the opportunity to respond to the allegations or

request withdrawal of application." (Second Mot. Dismiss 18.) Villarreal alternatively contends

that his due process rights were violated because he "had a constitutional right to counsel" during

the expedited removal proceedings. (*Id.* at 18.) The United States responds that, because the

"relief[] defendant . . . complains about are entirely discretionary[,] . . . . they do not rise to the

level of due process rights." (Resp. Second Mot. Dismiss 18.) The United States argues that

Villarreal had neither the right to participate in the expedited removal process nor the right to

counsel in the expedited removal process. According to the United States, Villarreal cannot

establish a due process violation, meaning that he fails to establish that the deportation

proceedings were fundamentally unfair.

The Court declines to determine whether Villarreal adequately articulates a due process

violation because, even assuming that Villarreal had the due process rights he asserts,[17] he cannot

---

    [17] The Court notes that binding Fourth Circuit law holds that "because removal proceedings are not criminal proceedings, aliens facing removal are not entitled to the Sixth Amendment's right to counsel, nor to the associated right to effective counsel." *Afanwi v. Mukasey*, 526 F.3d 788, 796 (4th Cir. 2008), *vacated on other grounds by Afanwi v. Holder*,

demonstrate prejudice that could have resulted from any alleged due process violation. For this reason, Villarreal fails to establish that the proceedings leading to the November 20, 2014 Order of Removal were fundamentally unfair.

**B.     Villarreal Fails to Show Prejudice Because He Does Not Establish a Reasonable Probability that He Would Not Have Been Deported**

In order to demonstrate prejudice resulting from a due process violation in an immigration proceeding, Villarreal must meet *Wilson's* so-called "reasonable likelihood/but for test;" he must "show 'a reasonable likelihood that but for the errors complained of, the defendant would not have been deported.'" *Wilson*, 316 F.3d at 511 (quoting *United States v. Encarnacion-Galvez*, 964 F.2d 402, 407 (5th Cir. 1992)). In Villarreal's case, he must show a

---

558 U.S. 801 (2009) (footnote omitted). In briefing, Villarreal appeared to unsuitably sidestep this binding law by attempting to ground his asserted right to counsel during the expedited removal proceedings in either: (1) the immigration officers' statement to him that he had a right to counsel; or, (2) the "procedural due process right to counsel under the *Mathews v. Eldridge*, 424 U.S. 319 (1976), balancing test." (Reply Second Mot. Dismiss 14, ECF No. 32.)

At oral argument, counsel for Villarreal clarified that he intended to rest his right-to-counsel argument on Villarreal's right to counsel in his criminal prosecution, initiated soon after the November 20, 2014 Order of Removal was entered. Counsel clarified his assertion that Villarreal, when requesting the presence of counsel before answering the questions the immigration officers asked, sought to invoke his Fifth Amendment right against self-incrimination in that criminal proceeding. This explanation does not change the Court's analysis.

Although declining to decide whether a Fifth Amendment right to counsel exists in the context of immigration proceedings, or whether the possibility of subsequent prosecution based on statements made in an immigration proceeding confers such a right, the Court notes that the Fourth Circuit has expressly held "there is no Fifth Amendment right to *effective* assistance of counsel during the course of removal proceedings." *Cruz v. Holder*, 321 F. App'x 280, at *1 (4th Cir. 2009) (per curiam) (emphasis added) (citing *Massis v. Mukasey*, 549 F.3d 631, 637 (4th Cir. 2008); *Afanwi*, 526 F.3d at 799). Given the Fourth Circuit's holding that no constitutional right to *effective* assistance of counsel under the Fifth Amendment exists in removal proceedings, *see id.*, the Court finds it unlikely that any right to assistance of counsel in removal proceedings exists under the Fifth Amendment at all. However, because Villarreal fails to establish any prejudice resulting from any asserted due process violation, the Court need not reach that issue.

reasonable likelihood that he would have been granted a withdrawal of application.[18]  Villarreal

cannot make this showing, meaning that his collateral attack fails.

### 1.    Withdrawal of Application is a Largely Discretionary Procedure

"An alien applying for admission may, *in the discretion of the Attorney General* and at

any time, be permitted to withdraw the application for admission and depart immediately from

the United States." 8 U.S.C. § 1225(a)(4) (emphasis added). "The Attorney General may, in his

or her discretion, permit any alien applicant for admission to withdraw his or her application for

admission in lieu of . . . expedited removal under [8 U.S.C. § 1225(b)(1)]." 8 C.F.R. § 1235.4.

No dispute exists that, had Villarreal been allowed to withdraw his application for admission, the

current prosecution for illegal reentry could not be predicated on the events surrounding his

November 20, 2014 entry into the United States.  However, a grant of withdrawal of application

rests in the discretion of the Attorney General, and the implementing regulations state that

"nothing in this section shall be construed as to give an alien the *right* to withdraw his or her

application for admission.  Permission to withdraw an application for admission should not

normally be granted unless the alien intends and is able to depart the United States immediately."

*Id.*

Villarreal contends that before mid-2013, "immigration officers considering whether to

allow withdrawal consulted a list of factors in the Customs and Border Protection Inspectors'

Field Manual." (Second Mot. Dismiss 16 (citing *United States v. Raya-Vaca*, 771 F.3d 1195,

1207 (9th Cir. 2014).)  Those non-exhaustive factors included:

> (1) the seriousness of the immigration violation; (2) previous findings of
> inadmissibility against the alien; (3) intent on the part of the alien to violate the

---

[18] Both parties agree that withdrawal of application is the only relief Villarreal could have
received that would have prevented him from being deported.

law; (4) ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and[,] (6) other humanitarian or public interest considerations.

*Raya-Vaca*, 771 F.3d at 1207 (quoting *Barajas-Alvarado*, 655 F.3d at 1090 (citing INS Inspector's Field Manual §17.2(a) (2001))).

These pre-2013 factors weigh heavily against any finding that Villarreal would have been granted withdrawal of application. Indeed, counsel for Villarreal conceded as much at oral argument. Villarreal, however, posits that "Customs and Border Protection have stated in current litigation" that immigration officers no longer rely on the Inspector's Field Manual for guidance on how to exercise their discretion to allow an alien to withdraw his or her application for admission.[19] (Second Mot. Dismiss 16 (citing *AILA*).) Villarreal thus asserts that "the standards that immigration officers now use to decide whether to grant withdrawal of application are unknown, if there are any standards at all." (*Id.* at 17.)

---

[19] Villarreal contends that Customs and Border Protection (the "CBP") "'has endeavored to develop a new manual, the Officers['] Reference Tool (ORT),'" which is "'a centralized online repository for CBP's admissibility policies and serves as a comprehensive "how to" manual detailing official CBP policies and procedures for CBP's admissibility mission.'" (Second Mot. Dismiss 16–17 (quoting Hutton Decl. ¶ 5, ECF No. 16-2, *Am. Immigration Lawyers' Assoc. v. United States Dep't Homeland Sec.* (*AILA*), No. 1:16cv2470 (D.D.C. filed Dec. 19, 2016).) He further asserts that, because these policies are "directly relevant to whether there is a reasonable probability that [Villarreal] would have been granted such relief," counsel for Villarreal requested in discovery these policies from the United States, but never received a copy. (*Id.* at 17 n.3.)

The United States counters that the requested policy manual is not subject to discovery under Federal Rule of Criminal Procedure 16(a)(1)(E). (Resp. Second Mot. Dismiss 28 n.16.) Rule 16(a)(1)(E) requires in relevant part that the United States must provide an item to the defendant if the item is "within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or[,] (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). "'[E]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)). The United States asserts that the policy manual Villarreal seeks does not meet the relevant standard of materiality, and is therefore not discoverable. (Resp. Second Mot. Dismiss 28 n.16.)

### 2. Villarreal Fails to Establish a Reasonable Probability that He Would Have Been Granted a Withdrawal of Application

In order to determine whether Villarreal has established that he suffered prejudice from his asserted due process denial, the Court must consider whether Villarreal has shown that a reasonable probability exists that he would not have been deported. *See Wilson*, 316 F.3d at 511. That requires the Court to determine the likelihood that Villarreal would have been granted a withdrawal of application. Because Villarreal fails to establish a reasonable probability that he would have been granted a withdrawal of application, the Court finds that he cannot show that he suffered prejudice.

#### a. Villarreal Does Not Establish that He Would Even Have *Requested* Withdrawal of Application

As an initial matter, the Court could find that Villarreal fails to meet his burden because he does not establish that he would have even *requested* withdrawal of application had he not been "denied the opportunity to respond to the allegations" of inadmissibility. (Second Mot. Dismiss 18.) Villarreal submits no evidence—or even argument—that he knew of his ability to request withdrawal of his application.[20] Villarreal also—appropriately—does not argue that he was entitled to be *advised* of that possibility. *See United States v. Arredondo-Martinez*, No. CR10-525-GHK, 2011 WL 13196331, at *7 (C.D. Cal. Oct. 3, 2011) ("Defendant points to no authority, nor are we aware of any, that an alien must be specifically advised of his right to withdraw his application."), *aff'd*, 492 F. App'x 823 (9th Cir. 2012). However, even assuming

---

[20] Villarreal creatively sidesteps this failure by asserting that the immigration officers "denied him the opportunity to . . . request withdrawal of application," (Second Mot. Dismiss 18), and then arguing that the relevant prejudice analysis is "whether a request to withdraw admission *with the assistance of counsel* would have succeeded," (*id.* at 24 (emphasis added)). However, Villarreal does not even assert—much less establish—that, had he been allowed "the opportunity to respond to the allegations," (*id.* at 18), he would even have *requested*, much less been *granted* withdrawal of application.

that Villarreal would have sought to withdraw his application, he nevertheless fails to establish a reasonable probability that this request would have been granted.

### b. Villarreal Improperly Attempts to Rely on the United States' "Failure" in Discovery without Having Filed Any Motion Asserting a Discovery Violation

Villarreal first argues that, because the United States did not provide him with the requested ORT policy manual, the Court "has discretion here under [Federal Rule of Criminal Procedure 16(d)(2)(D)[21]] simply to presume that the undiscovered materials would have been favorable to the defense . . . and conclude that prejudice would have been established." (Second Mot. Dismiss 25.) Villarreal's argument falters for several reasons.

First, the United States contends that the materials to which Villarreal refers are not in fact discoverable. (Resp. Second Mot. Dismiss 28 n.16.) Villarreal has filed no motion seeking to compel the United States to provide the requested documents. A motion to compel discovery is the proper procedural mechanism through which to argue the merits of Villarreal's contention that the United States has failed to turn over discoverable material. The Court declines to weigh in on a discovery issue improperly presented, as it is, in footnotes of the parties' briefs on the Second Motion to Dismiss. *See, e.g.*, E.D. Va. Loc. Crim. R. 47(F)(1) ("All motions . . . shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies."). And, especially given the multiple opportunities this Court provided Villarreal to address these issues, Villarreal has waived any right to have this discovery matter considered.

---

[21] Rule 16(d)(2)(D) provides in relevant part: "If a party fails to comply with [Rule 16], the court may: . . . enter any . . . order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D).

More importantly, in the context of the Second Motion to Dismiss, Villarreal bears the burden of establishing prejudice from any purported due process violation. *See Wilson*, 316 F.3d at 510. Villarreal thus must establish a reasonable probability that he would have been granted withdrawal of application. *See El Shami*, 434 F.3d at 665. Villarreal's speculative assertion that "the standards that immigration officers now use to decide whether to grant withdrawal of application are unknown, if there are any standards at all," (Second Mot. Dismiss 17), cannot carry the burden he bears.

### c. Villarreal Fails to Establish Prejudice Based Even on His Suggested "Realistic Probability" Standard

Perhaps recognizing his difficulty in establishing prejudice under the Fourth Circuit's governing requirement that he "show 'a reasonable likelihood that but for the errors complained of, [he] would not have been deported,'" *Wilson*, 316 F.3d at 511 (quoting *Encarnacion-Galvez*, 964 F.2d at 407), Villarreal argues in the alternative that the Court should apply the "indistinguishable 'realistic probability' standard" as set forth in *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007). (Second Mot. Dismiss 25 (quoting *Duenas-Alvarez*, 549 U.S. at 193).) As defined in *Duenas-Alvarez*, a defendant may establish realistic probability that a statute would be applied a certain way by showing "that the statute was so applied in his [or her] own case," or by pointing "to his [or her] own case or other cases in which the state courts in fact did apply the statute in the special . . . manner for which he [or she] argues." 549 U.S. at 193. Villarreal attempts to satisfy his proposed standard by identifying "an instance where immigration officers granted withdrawal to an individual who had previously been ordered removed, lied to immigration officers, was charged and convicted of a felony for that lie, and was sentenced to 12 months of imprisonment." (Second Mot. Dismiss 25–26 (citing *Raya-Vaca*, 771 F.3d at 1209).)

26

But applying the *Duenas-Alvarez* standard of "realistic probability" to the circumstance

before the Court improperly wrenches that standard from its context. In *Duenas-Alvarez*, the

Supreme Court determined whether an alien's conviction (in *Duenas-Alvarez*, a conviction for

aiding and abetting a theft offense) fell within the scope of convictions that subject aliens to

removal from the United States. 549 U.S. at 185–86. The Supreme Court noted that, in

determining whether a conviction falls within the scope of a listed offense, "the lower courts

have uniformly applied" an approach that examines whether the conviction—as described by the

statute defining the crime, not the facts of the particular case—falls within the generic definition

of the listed crime. *Id.* at 186. Evaluating Duenas-Alvarez's arguments that his conviction for

aiding and abetting a theft could criminalize conduct that fell outside the generic definition of

theft, the Court held that,

> to find that a state statute creates a crime outside the generic definition of a listed
> crime in a federal statute requires more than the application of legal imagination
> to a state statute's language. It requires a realistic probability, not a theoretical
> possibility, that the State would apply its statute to conduct that falls outside the
> generic definition of a crime.

*Id.* at 193. The *Duenas-Alvarez* Court then stated that, to establish a "realistic probability" that

the state would do so, the offender "must at least point to his own case or other cases in which

the state courts" so applied the statute. *Id.*

The context in which the *Duenas-Alvarez* Court defined "realistic probability," does not

allow the standard to readily translate to the question before this Court: whether Villarreal

would have been granted withdrawal of application and thereby not have been deported. But

even assuming that Villarreal's proposed "realistic probability" could replace or substitute for the

applicable standard, which requires that Villarreal meet *Wilson*'s "reasonable likelihood/but for

test," *Wilson*, 316 F.3d at 511,[22] he fails to establish either "that the statute was so applied in his own case," or to identify "other cases in which the state courts in fact did apply the statute in the special . . . manner for which he argues." *Duenas-Alvarez*, 549 U.S. at 193. The single documented instance which Villarreal says supports his argument of prejudice differs in important ways from Villarreal's particular circumstances leading to the November 20, 2014 Order of Removal.

Villarreal attaches to his Motion to Dismiss a one-page document entitled "Withdrawal of Application for Admission/Consular Notification." (Second Mot. Dismiss Ex. 1 at 12, ECF No. 28-1.) According to Villarreal, this document describes a *Duenas-Alvarez*-qualifying "other case" in which an individual "in an identical position to Mr. Villarreal" was granted withdrawal of application. (Reply Second Mot. Dismiss 1.) The document, dated June 26, 2009, states that the individual "came to the attention of [immigration officials] pursuant to his incarceration with the California City Correctional Center." (Second Mot. Dismiss Ex. 1 at 12.) The individual had been "ordered excluded from the United States" once before. (*Id.*) The individual had been convicted of False Statement to a Federal Officer, in violation of 18 U.S.C. § 1001, and sentenced to twelve months in prison. The immigration officials allowed that individual to withdraw his application, and he thereby avoided an order of removal.

Villarreal cannot establish prejudice based on this single identified grant of withdrawal of application. First, the Court is disinclined to find that Villarreal could establish a reasonable likelihood—or even a realistic probability—by pointing to one single individual who, for

---

[22] The Court assumes this equivalence for purposes of the Second Motion to Dismiss, but notes that the "realistic probability" seems to be a lower standard than the requisite reasonable likelihood. *Duenas-Alvarez* explicitly contrasts "realistic probability" with "legal imagination" and "theoretical possibility." 549 U.S. at 193. This contrast implies that the *Duenas-Alvarez* standard might emphasize *realistic* more than *probable*. Regardless, Villarreal cannot establish prejudice under either standard.

unknown reasons, was allowed to withdraw his application five years before Villarreal tried to

re-enter the United States. *See United States v. Garcia-Gonzalez*, 791 F.3d 1175, 1180 (9th Cir.

2015) ("The mere fact that [one] other alien[] in a position arguably similar to [Villarreal's]

position w[as] allowed (for reasons unknown) to withdraw [his] application[] for admission

establishes nothing more than relief in that situation is *possible*." (emphasis added)). Moreover,

even assuming Villarreal *could* meet his burden by relying on one individual "in an identical

position" who was granted withdrawal of application, this anonymous individual could never

serve in that role because he differs from Villarreal in important ways.[23]

First, the information before the Court about the individual's criminal history reflects

only a single conviction for False Statement to a Federal Officer. As of November 20, 2014,

Villarreal had seven criminal convictions: six misdemeanors and one felony. (Stipulation 1–2.)

This alone places Villarreal in a materially different circumstance than the individual to whom he

points. Second, immigration officials became aware of Villarreal's purported comparator

because he was incarcerated—again, substantially different from Villarreal, who was

apprehended attempting to cross the border with a false passport. Finally, the document includes

no information about the individual's ties to the United States, which could prove important in

deciding whether to grant withdrawal of application. *See, e.g.*, *Raya-Vaca*, 771 F.3d at 1208. In

sum, on November 20, 2014, Villarreal stood in a meaningfully different position than the

---

[23] The Court also notes that this individual apparently was allowed to withdraw his application in 2009 when the Inspector's Field Manual guided immigration officers' decisions about when to grant withdrawal of application. *See, e.g.*, *Barajas-Alvarado*, 655 F.3d at 1090 (citing INS Inspector's Field Manual §17.2(a) (2001). Assuming, as Villarreal argues, the ORT now guides the decision, this individual's withdrawal of application provides even less support for a finding that it is reasonably likely—or realistically possible—that Villarreal would also be allowed to withdraw his application.

individual on whom he seeks to rely to establish a realistic possibility that he would have been granted withdrawal of application.

Villarreal also appears to rely on *United States v. Raya-Vaca*, 771 F.3d 1195, to claim that Raya-Vaca might serve as a second comparator to show that withdrawal of application was plausible in Villarreal's situation. Villarreal's comparison of his own situation to Raya-Vaca's fails for reasons similar to those defeating his reliance on the anonymous individual included in his exhibit.[24] Villarreal's reliance on *Raya-Vaca* likewise does not further his ability to establish prejudice.

First, unlike the circumstances under which Villarreal entered the United States, the *Raya-Vaca* court noted, "[f]irst and foremost, Raya-Vaca committed no fraud, let alone obvious or deliberate fraud, when entering the United States." 771 F.3d at 1207–08. Villarreal, in contrast, violated the False Entry Statute by "falsely represent[ing] himself . . . to be a citizen of the United States for a purpose or benefit under the Act . . . or any other Federal or State law." (O. Removal 2, ECF No. 28-1.) The *Raya-Vaca* court identified such fraud as "a *crucial* consideration that . . . *ordinarily militates against withdrawal.*" 771 F.3d at 1208 (quotations omitted) (emphasis added). The court also commented on Raya-Vaca's "fairly minimal" criminal history consisting only of misdemeanors. *Id.* at 1209. Unlike Raya-Vaca, at the time of the November 20, 2014 Order of Removal, Villarreal had accumulated seven criminal convictions, including one felony DWI conviction. And although the *Raya-Vaca* court found that Raya-Vaca presented "significant humanitarian considerations counseling in favor of relief," 771 F.3d at 1208, because Raya-Vaca's partner, children, and members of his family lived in the

---

[24] Because Raya-Vaca's expedited removal was ordered in 2012, the *Raya-Vaca* court also analyzed the plausibility of Raya-Vaca being granted withdrawal of application by reference to the Inspector's Field Manual—the manual that Villarreal contends no longer guides immigration officers' exercise of discretion or this Court's analysis of prejudice.

United States—much like Villarreal's situation—those humanitarian considerations cannot overcome the important dissimilarities between Raya-Vaca and Villarreal.

Given the important differences between the particular circumstances of Villarreal's case and the comparators he identifies, Villarreal cannot establish either a "realistic probability," *Duenas-Alvarez*, 549 U.S. at 193, or a "'reasonable likelihood that but for the errors complained of, [Villarreal] would not have been deported,'" *Wilson*, 316 F.3d at 511 (quoting *Encarnacion-Galvez*, 964 F.2d at 407). Even assuming that Villarreal identified a due process violation, he cannot show prejudice resulting from that violation, and he therefore fails to establish that the deportation proceedings were "fundamentally unfair." *Mendoza-Lopez*, 481 U.S. at 839.

### IV. Conclusion

For the reasons stated above, the Court will deny Villarreal's Second Motion to Dismiss the Indictment. (ECF No. 28.) An appropriate order will issue.

It is so ORDERED.

/s/
M. Hannah Lauck
United States District Judge

Date: 5/14/2018
Richmond, Virginia